IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERESA SMOOT D. TURNER,  *
          *
  Plaintiff,     *
          *
vs.         *  CIVIL ACTION 07-00194-CB-B
          *
MICHAEL J. ASTRUE,   *
Commissioner of    *
Social Security,   *
          *
  Defendant.    *

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Teresa Smoot D. Turner ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u>, and 1381 <u>et seq</u>. Oral argument was held on February 12, 2008. Upon careful consideration of the administrative record, memoranda of the parties and oral argument, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED and REMANDED.**

I. <u>Procedural History</u>

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on September 18, 2002. In her applications, Plaintiff alleged that she has been disabled since June 15, 2001 due to short and long term memory loss and scoliosis. (Tr. 66, 67-69, 328-329). Plaintiff's applications

were denied, and she did not appeal. (Tr. 37-38, 41-45, 330-331).
Plaintiff protectively filed new applications for disability
insurance benefits and supplemental security income on April 22,
2004. She alleged that she has been disabled since December 31,
2002 due to mental problems, scoliosis, and learning disability.
(Tr. 70-72, 77-78, 337-344). Plaintiff's applications was denied
initially, and she filed a timely Request for Hearing before an
Administrative Law Judge ("ALJ"). (Tr. 39-40 and 51).

On January 26, 2006, ALJ Alan E. Michel held an administrative
hearing which was attended by Plaintiff, her representative and
vocational expert Jody Skinner. (Tr. 393-426). On February 11,
2006, the ALJ entered an unfavorable decision in which he
determined that Plaintiff is not disabled. (Tr. 18-36). Plaintiff
filed a request for review which was initially denied by the
Appeals Council ("AC") on September 26, 2006. (Tr. 10-13). On
January 11, 2007, the AC set aside its September 26, 2006 decision.
After considering additional information, the AC again denied
Plaintiff's appeal. (Tr. 6-9). The ALJ's decision became the
final decision of the Commissioner in accordance with 20 C.F.R. §
404.981. (Tr. 6-8). The parties agree that this case is now ripe
for judicial review and is properly before this Court pursuant to
42 U.S.C. §§ 405(g) and 1383(c)(3).

**II. <u>Issue on Appeal</u>**

A.   Whether the ALJ erred by failing to consider the opinion
     of Nurse Practitioner Jimmy White.

III. **Factual Background**

Plaintiff was born on July 23, 1967, and was 38 years old at the time of the administrative hearing. (Tr. 96, 402). Plaintiff has an eighth grade education[1] and past work experience as a cashier, filing clerk and laundry assembler. (Tr. 78-79, 82, 125, 407-409). Plaintiff last worked as a filing clerk for Ro-tech in 2002. (Tr. 409). According to Plaintiff, she stopped working at Ro-Tech because she was sick and had to miss work. (Tr. 419).

Plaintiff testified that she lives with her two children who are ages 13 and 11. (Tr. 404). Plaintiff further testified that she keeps house for herself and two children, cooks, and does laundry. She also indicated that she can drive, but does not have a car, that she has a checking account, and that she spends her time playing with her dog, cleaning the house and cross-stitching and watching television. (Tr. 410-412, 416).

Plaintiff also testified that she suffered a head injury in a car accident in 1992 that has resulted in problems with her brain, and that she has been going to Mobile Mental Health ("MMH") for treatment for depression, every other week, and sometimes every week, since 2000. (Tr. 412-414). Plaintiff also indicated that she receives treatment at the Mobile Health Department ("MCHD") for things like a cold or x-rays of her back. (Tr. 414-415).

---

[1]Plaintiff testified that she took a class to study for her GED, but that she needs a lot of help before she takes the test. (Tr. 415).

Plaintiff's medications include Zoloft and Geodon for depression and Trazadone for sleeping. (Tr. 105, 157). According to Plaintiff, her medications help; however, some of them make her sleepy. (Tr. 406, 420).

**IV. <u>Analysis</u>**

**A. <u>Standard of Review</u>**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).[2] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding that substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into

---

[2]This Court's review of the Commissioner's application of legal principles is plenary. <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.   Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[3]

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's

In case <u>sub</u> <u>judice</u>, the ALJ determined that Plaintiff met the nondisability requirements for a period of disability and disability insurance benefits and was insured for benefits through the date of the decision.  (Tr. 18-36).  The ALJ concluded that Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date.  <u>Id.</u>  The ALJ determined that while Plaintiff has impairments of scoliosis, mental problems and a learning problem, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4.  (Tr. 18-36).  <u>Id.</u>  The ALJ then concluded that Plaintiff retains the residual functional capacity ("RFC") to perform a full range of unskilled light work, and that she can perform her past relevant work as a file clerk.  Thus, she is not disabled.  <u>Id.</u>  The relevant evidence[4] is detailed below.

_____

age, education and work history.  <u>Id</u>. at 1005.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999).  <u>See</u> <u>also</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[4]Plaintiff's single issue on appeal relates to the ALJ's disregard of Mr. White's RFC assessment, which sets forth limitations resulting from her mental disorder.  Thus, while the entire transcript has been reviewed, only the evidence of record relating to her mental disorder is specifically set forth here.

Plaintiff received treatment at the Mobile Mental Health Center ("hereinafter "MMH")on July 30, 1999.  An MMH Interdisciplinary Treatment/Care Plan dated July 30, 1999 reflects that Plaintiff was diagnosed with adjustment disorder with depression.  It was noted that Plaintiff reported frequent crying spells, no support system, poor sleep, and difficulty maintaining relationships.  (Tr. 267-269).

On December 14, 1999, Fajani Joshi, M.D., an MMH doctor, noted that Plaintiff had failed to keep her appointments, that she reported that she had been depressed for years, and that she related a family history of mental illness.  Plaintiff also reported that she had been mentally abused by her ex boyfriend, who had also sexually abused all four of her children.  She reported that her children were sent to their fathers as a result, and that she was not allowed to see them.  Plaintiff also reported crying often.  She was diagnosed with adjustment disorder with depressed mood and borderline intelligence functioning.  She was prescribed Prozac and counseling for depression.  (Tr. 278-280).

On January 11, 2000, MMH social worker Fairlie Schriber noted that Plaintiff was attending GED classes and  was feeling better on Prozac.  Plaintiff also indicated that she wanted to learn coping skills.  (Tr. 277).

On January 25, 2000, MMH nurse Marian Mason observed that Plaintiff's appearance and grooming were appropriate, her

7

concentration was not impaired, her affect was appropriate and her speech was spontaneous. Plaintiff reported that her mood had improved, and that her appetite and sleep had improved as well. Her mood was euthymic, her energy was low, her insight was fair, her judgment was fair, her memory was unimpaired, her thoughts/perceptions were logical and coherent, and her sensorium was oriented. It was noted that she was a low suicidal/homicidal risk, and she was assessed as marginally stable. (Tr. 276).

On March 22, 2000, MMH's Dr. Joshi noted that Plaintiff reported throwing away her Prozac because her mother told her it was addictive. Plaintiff also reported that she had dropped out of the GED program because she was unable to concentrate. (Tr. 275). On May 12, 2000, MMH nurse Glenda Blair observed that Plaintiff's appearance and grooming were appropriate, her concentration was not impaired, her mood was irritable, her insight and judgment were fair, her memory was impaired, her thoughts/perceptions were paranoid, her sensorium was oriented, and she had suicide ideation but no plan. Plaintiff reported that her sleep was poor and that her appetite was good. Plaintiff also reported that she "goes crazy" and has outbursts, and that she was frustrated and wanted help. (Tr. 274).

On June 2, 2000, MMH social worker Ms. Schriber observed that that Plaintiff's appearance and grooming were appropriate, her concentration was not impaired, her affect was labile, her speech

was circumstantial and tangential, her mood was irritable and bitter, her energy was average, her insight was poor, her judgment was poor, her memory was unimpaired, her thoughts/perceptions were logical and coherent, her sensorium was oriented, and she was a low suicidal/homicidal risk. Plaintiff reported that her appetite and sleep were poor, and that she had stopped taking Prozac. (Tr. 273). On June 19, 2000, Ms. Schriber observed that Plaintiff's appearance and grooming were appropriate, her concentration was not impaired, her affect was appropriate, and her speech was spontaneous. Plaintiff reported feeling a little better, and that her appetite and sleep were good. Plaintiff's mood was euthymic, her energy was average, her insight was fair, her judgment was fair, her memory was unimpaired, her thoughts/perceptions were logical and coherent, her sensorium was oriented, and she was a low suicidal/homicidal risk. Plaintiff was assessed as marginally stable. (Tr. 270).

On June 19, 2000, MMH doctor Charles Smith, M.D. noted Plaintiff's "scattered presentation," and that Plaintiff had reported a five-day migraine headache. (Tr. 271).   On the same day, MMH nurse Ms. Blair observed that Plaintiff's appearance and grooming were appropriate, her concentration was not impaired, her affect was appropriate, her speech was spontaneous, her mood was irritable and her energy was average. Her insight and judgment were fair, her memory was unimpaired, her thoughts/perceptions were paranoid, her sensorium was oriented, and she had suicidal ideation,

but no plan.   Plaintiff reported that her appetite and sleep were fair, and that she was feeling better about her mandatory move.  She was assessed as marginally stable.  (Tr. 272).

In a MMH Transfer/Discharge Summary dated October 3, 2000, Ms. Schriber diagnosed Plaintiff with adjustment disorder with depressed mood.  She noted that the reason for Plaintiff's admission was that she was depressed and anxious, and was having problems handling her children alone, with limited income and no support from her family. Ms. Schriber further noted that Plaintiff did not keep her appointments on a regular basis, that she was last seen on June 19, 2000, and that she had not responded to attempts to reschedule her. (Tr. 265-266).  A MMH Transfer/Discharge Summary dated October 31, 2000 reflects that Plaintiff terminated her treatment against advice.   Her diagnosis was  cannabis abuse and curvature in her spine.  (Tr. 263-264).

Plaintiff sought treatment from the Family Medical of Mobile ("FM")on June 18, 2001.  She reported that she had ulcers in her mouth and on her lip, and that she had experienced sinus congestion for eleven days.  The office notes reflect that Plaintiff could not get to the subject and she had flight of ideas.  She rambled about problems with a "no good" husband,  anorexia and weight loss.   The notes further reflect that Plaintiff "thought she was on antibiotics but she wasn't."  Plaintiff was prescribed Allegra for sinus congestion, Daypro for pain, and Paxil for nervousness.  (Tr.

169).  She returned to FM on July 3, 2001, and reported that she
was managing fairly well on Paxil, although she complained of
drowsiness.  Plaintiff also reported that she had not been to work
since June 10.  She was given a note that reflected that she had
anxiety, chest pain and recurrent abdominal pain from June 10th
through July 3rd, and that she "should be able to return to work on
July 5, 2001." (Tr. 167).

Plaintiff returned to MMH for treatment on August 1, 2002.
She was diagnosed with cannabis abuse, curvature in spine, and
abuse issues.  Her GAF was 55.  It was noted that Plaintiff needed
to complete "12 week phase and then move to afer-care." (Tr. 262).
A MMH treatment noted dated August 5, 2002 reflects that a
discussion was held with Plaintiff regarding continuing the
program, and that testing revealed that she was positive for
cannabis. (Tr. 261).

An MMH intake assessment dated August 12, 2002 reflects that
Plaintiff was living at Penelope House, that she was unemployed,
and that she had been taking Zoloft for 3 weeks, that she vaguely
understood her problems, and that she had been referred by Penelope
House and herself. (Tr. 258).  On exam, Plaintiffs's appearance
and screening were appropriate, her behavior was cooperative and
childish, and her mood, affect and speech were normal.  She
reported that her sleep was good and she denied any
suicidal/homicidal thoughts.  Plaintiff also reported that her mind

11

"wanders off" and that she was forgetful.   It was noted that Plaintiff's thoughts were coherent, her judgment was adequate and her insight was poor.  (Tr. 258-260).   A MMH transfer/discharge summary dated August 12, 2002 reflects that Plaintiff reported that she needed to see a neurologist to examine her brain as a result of being in a coma following a car accident in 1992.  (Tr. 277). Plaintiff denied any mood disturbance, hallucinations or thought disturbance.  She was described as stable and was to be referred to "outside for treatment or counseling as needed or appropriate." (Tr. 256-257).

Plaintiff was treated on September 13, 2002 by Stephen Andrews, M.D., at Greater Mobile Physicians, for bronchitis and allergic rhinitis.   Dr. Andrews noted that Plaintiff relayed a history of depression and reported that she was Zoloft.  She also reported that she was in a motor vehicle accident in 1992 and as a result, she experiences long and short term memory loss.  (Tr. 170-173).

Plaintiff was seen by Cheryl Rose, PhD, of the Family Counseling Center from September 18, 2002 to October 14, 2002. Plaintiff related a history of childhood abuse and troubled adult relationships.  Her relevant health/medical issues were listed as "scoliosis, on Zoloft" and "probable brain damage" from car wreck that left her in a comma for 3 days.  Plaintiff denied any addiction problems and reported prior treatment at MMH in 2000.

12

Plaintiff denied any suicidal or homicidal thoughts. On examination, her appearance was appropriate, her attitude was cooperative, her behavior was calm, her mood was depressed, her affect was flat, her speech was appropriate, her thinking was suspicious and her judgment was unknown. (Tr. 177-178). An October 14, 2002 entry reflects that Plaintiff reported car problems and asked for a telephone session. The counselor discussed with Plaintiff the importance of a good standard of behavior and some guides. (Tr. 176).

Melissa Ogden, Ph.D., evaluated Plaintiff on October 28, 2002 at the request of the Alabama Department of Rehabilitation Services ("ADRS"). Dr. Ogden administered the Wechsler Adult Intelligence Scale, the Wide Range Achievement Test-3, the Trail Making Test, the Wisconsin Card Sorting Test, the Controlled Oral Word Association, the Wechsler Memory Scale, the Repeatable Battery for the Assessment of Neuropsychological Status, the Grooved Pegboard, and the Incomplete Sentences. On observation, Dr. Ogden noted that Plaintiff comprehended conversation normally, that her affect was normal and her thought processes were logical and goal-directed, and that she was attentive and cooperative throughout the evaluation. Dr. Ogden opined that Plaintiff put forth good effort such that the results are considered a valid reflection of her current cognitive abilities. Dr. Ogden found that Plaintiff demonstrated borderline intellectual abilities, with commensurate

math-based academic skills, and with reading and spelling capabilities below expectation, suggestive of learning difficulties. She noted that assuming Plaintiff's account of a loss of consciousness exceeding 24 hours is accurate, she may have residual cognitive sequelae from serious injury to her head; however, she stated that most aspects of the results of her testing likely reflect her limited education, learning difficulties, and likely longstanding limited intellectual and cognitive capabilities. (Tr. 187-188).

Dr. Ogden opined that Plaintiff's goal of obtaining a GED would likely be difficult to achieve, given her deficient academic skills, but that her chances would improve if the written portion were waived and she could take the test without time constraints. Finally, Dr. Ogden opined that Plaintiff's ability to learn new verbal information is limited and that she is overcome with multiple pieces of information at once, in that she learns best when information is presented in multiple modalities and when she is provided with prolonged and repeated exposure to the information. Dr. Ogden diagnosed Plaintiff with depressive disorder, learning disorder, and cannabis abuse in remission. (Tr. 182-188). She strongly encouraged continued treatment for Plaintiff's depression, and noted that in addition to medication management, Plaintiff would benefit from attending regular sessions with a therapist. (Id.)

Ellen N. Eno, Ph.D., prepared a Mental RFC Assessment dated January 9, 2003, at the request of the Agency.  She opined that Plaintiff is moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.  She further opined that Plaintiff can understand, remember and execute short, simple directions, and attend for two hours.  She also opined that Plaintiff should not have frequent contact with the general public, that changes in job routine should be minimal, and that she would benefit from assistance in setting realistic goals.  (Tr. 192-194).

In a Psychiatric Review Technique dated January 9, 2003, Dr. Eno lists Plaintiff's impairments as borderline IQ, depression disorder, and cannabis abuse in full remission.  She opined that Plaintiff is moderately limited in her ability to maintain social functioning and in her ability to maintain concentration, persistence or pace and mildly restricted in her activities of daily living.  She found that Plaintiff has had no episodes of decompensation.  (Tr. 196-206).

Lucille T. Williams, Psy.D. conducted a  mental examination on of Plaintiff on August 16, 2004.  On examination, Dr. Williams observed that Plaintiff's affect was sad and irritable.  Plaintiff

15

did not appear anxious, but her mood seemed depressed. Dr. Williams noted that Plaintiff was oriented to person, place, and purpose, and that her thought processes were grossly intact, with no loose associations, and no tangential, or circumstantial thinking. She further noted that Plaintiff did not appear confused, that her conversation was normal, that her insight and understanding of herself were fair, that her judgment was fair, that she was seen as able to manage her funds, and that her estimated intelligence was low average to average. Dr. Williams diagnosed Plaintiff with dysthymic disorder and major depressive disorder, and opined that it was "likely" that Plaintiff would have favorable response to treatment, including psychotherapy, within the next six to twelve months. (Tr. 217-220).

A DDS physician completed a Mental RFC Assessment on August 24, 2004. He opined that Plaintiff is not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision, and to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to

16

perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (Tr. 221-224).

The physician further opined that Plaintiff is moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. The doctor found that Plaintiff is able to understand, remember, and carry out very short and simple instructions, and can attend for two-hour periods; that her contact with the general public should be infrequent; and that changes in the work setting should be minimal. (Tr. 221-224). The physician completed a Psychiatric Review Technique form on the same date. On the form, he opined that Plaintiff's dysthymic disorder and depression disorder result in moderate difficulty in maintaining social functioning and maintaining concentration, persistence, or

pace, and a mild restriction of activities of daily life. (Tr. 226-240).

On October 8, 2004, MMH nurse practitioner James White observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal and her speech was unimpaired. She reported that she had been off her medications, that her appetite was good and her sleep was poor. She had no self injurious behavior, suicidal thoughts, or homicidal thoughts, but reported that she sometimes has difficulty concentrating, and that sometimes she hears things. Her memory was unimpaired, her thoughts were logical and coherent, and she had impaired concentration. (Tr. 251).

On October 8, 2004, MMH practitioner Norris Laurence observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was impaired. He noted that Plaintiff reported that her appetite and sleep were poor. Plaintiff was prescribed Geodon and was directed to follow-up in three months. (Tr. 252).

On November 5, 2004, Plaintiff had an individual therapy session with MMH social worker Kristen Hoffman. Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate,

her behavior was normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits and her thoughts were logical and coherent.    She further noted that Plaintiff's mood was irritable and sad, she had a hostile expression, her affect was tearful and her memory was impaired.   Plaintiff reported that her appetite was fair and her sleep was poor.   (Tr. 249-250).   In an individual therapy session on November 23, 2004, Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent and her concentration was unimpaired.   Plaintiff's appetite and sleep were described as fair and she had no self injurious behavior, suicidal thoughts, or homicidal thoughts. Plaintiff reported that she was not taking her medication, and  Ms. Hoffman described Plaintiff's condition as guarded. (Tr. 247-248).

In a report of an individual therapy session on December 2, 2004, Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, and her concentration was unimpaired.   Plaintiff reported that her appetite was fair, and her

sleep was poor.  Plaintiff again reported that she was not taking her medication because she wanted to talk with Mr. White about her symptoms.  (Tr. 245-246).

In a note dated December 13, 2004, Mr. White noted that Plaintiff reported irritability and mood swings, and indicated that she had poor sleep.  He observed that her appearance and grooming were appropriate and that her behavior, affect and speech were normal.  Plaintiff reported that her appetite was good and she denied any self injurious behavior, suicidal thoughts, or homicidal thoughts.  Her perceptions were within normal limits, her memory was unimpaired, her thoughts logical and coherent, and her concentration was unimpaired.  (Tr. 244).

In a MMH treatment noted dated December 14, 2004, Ms. Hoffman observed that Plaintiff had a sad and blunted affect, and that Plaintiff reported that her sleep and appetite were fair.  Ms. Hoffman further noted that Plaintiff had appropriate grooming; normal mood; no speech impairment, self-injurous behavior, or suicidal or homicidal thoughts; perceptions within normal limits; unimpaired memory; logical and coherent thoughts; and no concentration impairment.  Ms. Hoffman also noted that Plaintiff relayed legal problems regarding her son, and reported that she almost cried with her appointment with nurse practitioner Mr. White.  (Tr. 243).

In a MMH treatment note dated December 20, 2004, nurse

Adrienne Freeman noted that Plaintiff reported mood swings, crying, depression, and poor, restless sleep. Ms. Freeman observed that Plaintiff had no speech impairment, good appetite, no self-injurious behavior or suicidal thoughts, unimpaired, logical and coherent memory, and no impairment in concentration. Plaintiff reported that she had stopped taking Geodon because it made her drowsy. Ms. Freeman noted that she consulted with Mr. White, who instructed Plaintiff to begin taking Zoloft. (Tr. 242).

In a treatment note dated January 13, 2005, Mr. White noted that Plaintiff reported inability to sleep, headaches, hearing voices, and seeing things. He observed that her appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, her appetite was good, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her memory was unimpaired, her thoughts logical and coherent, and her concentration was unimpaired. (Tr. 326). In a treatment note dated January 27, 2005, Mr. White noted that Plaintiff reported that she was sleeping better and her appetite was good. He observed that her appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired. (Tr. 325).

In a note dated January 27, 2005, Ms. Hoffman noted that Plaintiff's symptoms had improved, and that Plaintiff reported that she was sleeping well, that her appetite was good, that she was feeling less nervous, and that she was not experiencing any side effects from the medication. Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired. (Tr. 324).

In a treatment record dated February 23, 2005, Ms. Hoffman noted that Plaintiff reported that her sleep is poor due to the need to urinate during the night, and that she was receiving treatment for the problem. Plaintiff also reported that her appetite was fair. Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior and mood were normal, her affect was sad, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts and she denied auditory and visual hallucinations for the past few weeks. Her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired. (Tr. 322). In a treatment record dated March 10, 2005, Ms. Hoffman noted that Plaintiff seemed to be making some very good decisions

for herself, and reported that her appetite and sleep were good.
Ms. Hoffman observed that Plaintiff's appearance and grooming were
appropriate, her behavior and mood were normal, her affect was sad
with depression symptoms, her speech was unimpaired, she had no
self injurious behavior, suicidal thoughts, or homicidal thoughts,
her memory was unimpaired, her thoughts were logical and coherent,
and her concentration was unimpaired.   (Tr. 320-321).

In a treatment entry dated March 10, 2005, Mr. White noted
that Plaintiff reported that the medication was helping and that
her appetite and sleep were good.  He observed that her appearance
and grooming were appropriate, her behavior, mood and affect were
normal, her speech was unimpaired, she had no self injurious
behavior, suicidal thoughts, or homicidal thoughts, her perceptions
were within normal limits, her memory was unimpaired, her thoughts
were logical and coherent, and her concentration unimpaired.  (Tr.
319).

In a note dated March 23, 2005, MMH practitioner Evelyn
Harbaugh noted that Plaintiff reported that she thought the
medicine was beginning to help, that her sleep was better with the
medication, and that her appetite was poor.  Ms. Harbaugh observed
that Plaintiff's appearance and grooming were appropriate, her
behavior was uncooperative, her mood was guarded, her affect was
anxious, her speech was unusual, she had no self injurious behavior
or homicidal thoughts, but had suicidal thoughts without a plan,

23

her memory was unimpaired, her thoughts were racing, and her concentration was impaired.   (Tr. 318).

In a note dated March 29, 2005, Ms. Hoffman noted that Plaintiff reported feeling overwhelmed and smothered because her kids are out of school for spring break.  She also reported that her appetite and sleep were good.  Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior and mood were normal, her affect was sad and appropriate to the situation, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired. (Tr. 316-317).

In a note dated April 11, 2005, MMH nurse Freeman noted that Plaintiff was isolating herself from others, was experiencing mood swings and was depressed.  Plaintiff reported a good appetite and good sleep. (Tr. 315).  In a May 4, 2005 entry, Ms. Hoffman noted that Plaintiff was still making good decisions although she was still feeling overwhelmed.  Plaintiff reported that her appetite was good, and her sleep was fair as she could not nap during the day. Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior and mood were normal, her affect was sad, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were

24

within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired.   (Tr. 314).

In a note dated June 10, 2005, Mr. White noted that Plaintiff reported that she was experiencing difficulty sleeping, and sometimes hearing voices.  He noted that her moods were better and she had a good appetite.  He observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, she had auditory hallucinations, her memory was unimpaired, her thoughts were logical and coherent, and her concentration unimpaired.  (Tr. 313).

In a note dated July 18, 2005, Alana Wright, M.S., at MMH noted that  Plaintiff reported doing okay, but had blunted affect, and continued difficulty with memory and concentration. Plaintiff's appetite and sleep were fair.  Ms. Wright observed that Plaintiff's appearance and grooming were appropriate, her behavior and mood were normal, her affect was blunted, her speech was verbal when prompted, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was impaired, her thoughts were racing sometimes, and her concentration was impaired.  (Tr. 312).

In an MMH note dated September 13, 2005, Emma Davis, M.S.,

25

noted that Plaintiff reported that the medication made her sleepy and that she had homicidal thoughts, was hearing voices and seeing things.  Plaintiff also reported that her appetite was fair with recent weight change and that she was having trouble falling and staying asleep.  Ms. Davis observed that Plaintiff's appearance and grooming were appropriate, her behavior was normal, her mood was irritable, her speech was unimpaired, she had no self injurious behavior or suicidal thoughts, and she had impaired memory, racing thoughts, and impaired concentration.  (Tr. 311).  In a note dated October 20, 2005, Ms. Davis noted that Plaintiff reported that the medication helps control her current symptoms, that her appetite was good and her sleep was fair.  Ms. Davis observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect normal, her speech unimpaired, she had no self injurious behavior or suicidal or homicidal thoughts, she had a history of both auditory and visual hallucinations but none presently, she had unimpaired memory, racing thoughts, and unimpaired concentration.  (Tr. 310). She also noted no signs of decompensation.  (Tr. 310).

In a note dated November 30, 2005, Mr. White noted that Plaintiff reported having "ups and downs," with decreased sleep, and that her appetite was good.  He observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self

injurious behavior, suicidal or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired. (Tr. 309). In a note dated December 7, 2005, Mr. White noted that Plaintiff reported that she stopped taking Geodon, and that her appetite and sleep were good. He observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts logical and coherent, and her concentration unimpaired. (Tr. 308).

In a note dated January 5, 2006, Ms. Hoffman observed that Plaintiff's symptoms were currently managed with medication with no side effects mentioned. Ms. Hoffman further observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, her appetite and sleep were fair, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was impaired, her thoughts logical and coherent, and her concentration was impaired. (Tr. 307). In a note dated January 19, 2006, Ms. Hoffman noted that Plaintiff reported physical problems involving her chest, back and legs, and that she was still experiencing memory problems which "may be

related to previous head trauma or to post traumatic stress disorder." Ms. Hoffman observed that Plaintiff's appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, her appetite was fair and her sleep was good, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was impaired, her thoughts were logical and coherent, and her concentration was impaired.   (Tr. 305).

On January 19, 2006, Mr. White completed a Supplemental Questionnaire as to RFC.  In the Questionnaire, Mr. White opined that Plaintiff is moderately restricted in her activities of daily living, has experienced moderate episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms, and is moderately limited in her ability to respond appropriately to  supervision and to co-workers, and in her ability to perform simple tasks.  He also opined that Plaintiff  has marked difficulty  in  maintaining  social  functioning;  has  frequent deficiencies  of  concentration,  persistence  or  pace  resulting  in frequent  failure  to  complete  tasks  in  a  timely  manner,  and  is markedly  limited  in  her  ability  to  understand,  carry  out  and remember  instructions  in  a  work  setting  and  in  her  ability  to perform  repetitive  tasks  in  a  work  setting.   He  opined  that Plaintiff's impairment has lasted or is expected to last at least

12 months, that she has experienced this level of severity since 2000, and that a psychological evaluation was obtained.  Finally, Mr. White noted that the side effects of Plaintiff's medication are sexual dysfunction, sedation, and extrapyramidal side effects. (Tr. 301-303).

In a treatment note dated February 2, 2006, Mr. White noted that Plaintiff reported that she was doing well and sleeping okay. Plaintiff also reported that her appetite was good.  He observed that her appearance and grooming were appropriate, her behavior, mood and affect were normal, her speech was unimpaired, her appetite was good, she had no self injurious behavior, suicidal thoughts, or homicidal thoughts, her perceptions were within normal limits, her memory was unimpaired, her thoughts were logical and coherent, and her concentration was unimpaired.  (Tr. 350).

1.  **Whether the ALJ erred by failing to give any weight to the opinion of Certified Nurse Practitioner Jimmy White.**

Plaintiff contends that the ALJ erred by failing to give any weight to the opinion of Certified Nurse Practitioner Jimmy White. Pursuant to the regulations, a nurse practitioner is not considered "an acceptable medical source."  20 C.F.R. §§ 404.1513(a), 416.913(a).  Still, "evidence from other sources" such as nurse practitioners may be used to show the severity of [a claimant's] impairment(s) and how it affects [his/her] ability to" engage in work-related activities. 20 C.F.R. §§ 404.1513(d), 416.913(d).  The

opinions of a treating nurse practitioner are specifically listed as "other" medical sources who may present evidence of the severity of the claimant's impairment and the effect of the impairment on the claimant's ability to work, but cannot establish the existence of an impairment. Id. at § 404.1513(d)(1), 416.913(d)(1). See, e.g., Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004). An "ALJ is not free to disregard the opinions of health care professionals simply because they are not medical doctors". O'Connor v. Barnhart, No. 2004 WL 2192730, at *5 (N.D. Iowa September 28, 2004); See Social Security Ruling 06-03p[5], 2006 SSR LEXIS 5("Opinions from....medical sources...not technically deemed 'acceptable medical sources'...are important and should be

---

[5]Additionally, Social Security Ruling 06-03p: Titles II and XVI:   Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies ("SSR 06-03p) sets forth factors to be considered in evaluating evidence from both "acceptable medical sources," and "other" medical sources:

How long the source has known and how frequently the sources has see the individual;

How consistent the opinion is with other evidence; The degree to which the source presents relevant evidence to support an opinion;

How well the source explains the opinion;

Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

Any other factors that tend to support or refute the opinion.

evaluated on key issues...”); See also <u>Reliford v. Barnhart</u>, 444 F. Supp. 2d 1182, 1188 (N.D. Ala. 2006)(“improper and unreasonable for ALJ to reject opinions of treating physical therapist due to his not being acceptable medical source).

Social Security Ruling 06-03p is a clarification of existing SSA policies. <u>Sloan v. Astrue</u>, 499 F.3d 883, 888 (8th Cir. 2007). Specifically, the “ruling clarifies how [the Commissioner] consider[s] opinions and other evidence from medical sources who are not ‘acceptable medical sources.’’ As explained in the ruling:

> [The existing] regulations provide specific criteria for evaluating medical opinions from “acceptable medical sources”; however, they do not explicitly address how to consider relevant opinions and other evidence from “other sources” listed in 20 C.F.R. 404.1513(d) and 416.913(d). With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not “acceptable medical sources,” such as nurse practitioners, physician assistants, and licenced clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources....are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

2006 SSR LEXIS 4, [WL] at *3.

The ruling further directs that disability “adjudicator[s] generally should explain the weight given to opinions from these ‘other sources,’ or otherwise ensure that the discussion of the evidence...allows a claimant or subsequent reviewer to follow the adjudicator’s reasoning.”  2006 SSR LEXIS 4, [WL] at *6.

In the case at hand, the record reflects that Nurse

Practitioner Jimmy White and others on staff at MMH treated Plaintiff on multiple occasions, for several years, for her mental impairment, and that Mr. White prepared a Residual Functional Capacity Form, which included his opinions regarding limitations caused by said impairment.  The ALJ addressed Mr. White's opinions as follows:

> The Administrative Law Judge recognizes that Jimmy White, CRNP, completed a Residual Functional Capacity Form on which he stated the claimant has marked estimated degree of difficulty in maintaining social functioning and frequent estimated deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner.  Additionally, Mr. White found the claimant has marked limitations in her ability to understand, carry out and remember instruction in a work setting (Exhibit 22-F).  The Administrative Law Judge does not give any weight to the residual functional capacity completed by Mr. White because he is not a medical doctor.  In addition, his limitations conflict with the rest of the medical reports, including those from Mobile Mental Health.  As stated above, in the treatment note dated January 5, 2006, the therapist noted the claimant was currently managed on medication.

(Tr. 33).

Based upon a review of the record, the undersigned finds that the ALJ erred in rejecting Mr. White's opinions on the ground that he is not a medical doctor.  While Mr. White does not qualify as a treating source, he constitutes an "other source" under the regulations, and as such, the ALJ was required to consider his opinions with respect to the severity of Plaintiff's limitations. Thus, the fact that he is not a medical doctor is not a sufficient basis for rejecting his opinions on key issues such as impairment

severity and functional effects.  Moreover, while the ALJ asserted
that the limitations listed by Mr. White conflicted with the rest
of the medical reports, he did not explain or elaborate on the
alleged inconsistencies.  His reference to a MMH treatment note,
dated January 5, 2006, which indicates that Plaintiff is being
managed on medication does not suffice because the fact that
Plaintiff was being managed on medication does not address the
issue of whether she has limitations as a result of her mental
impairments, and the extent of any such limitations.  Given that
Plaintiff has received mental health treatment from the MMH for
several years, that Mr. White was directly involved in her
treatment, and that the treatment records reflect that Plaintiff's
mental condition has waxed and waned over the years[6], Mr. White's
opinion regarding Plaintiff's limitations is the precise type of
information that SSR 06-3p requires the ALJ to afford serious
consideration.  Based upon a review of the record, the undersigned
is unable to conclude that the ALJ complied with SSR 06-3p in
reviewing Mr. White's opinions.  Thus, this case should be remanded

---

[6]The treatment notes reflect that at times, Plaintiff's
thought were clear, and her memory and concentration were
unimpaired, while at other times, her mood was depressed, she
reported hearing voices and having sucicidal thoughts, her
thoughts were racing, and her memory and concentration were
impaired.  Additionally, it is noteworthy that one of the doctors
who conducted a consultative examination strongly recommended
that Plaintiff continue to receive treatment for depression, and
noted that in addition to her medication management, Plaintiff
would benefit from attending regular sessions with a theraptist.
(Tr. 188, 252, 276, 278-279, 307, 324, 348-349).

so that the ALJ can consider Mr. White's opinions in light of SSR 06-03p.

### V.   Conclusion

For the reasons set forth, and upon careful consideration of the administrative record, memoranda of the parties and oral argument, it is **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income, be **REVERSED and REMANDED.** The attached sheet contains important information regarding objections to this Report and Recommendation.

**DONE** this **10th** day of **September, 2008.**


                              _____/s/ SONJA F. BIVINS_____
                              **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.   <u>**Objection**</u>.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   <u>See</u> 28 U.S.C. § 636(b)(1)(c)); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   <u>**Opposing party's response to the objection.**</u>   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   <u>**Transcript (applicable where proceedings tape recorded)**</u>. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to

this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

/s/ SONJA F. BIVINS
UNITED STATES MAGISTRATE JUDGE